UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

UNITED STATES OF AMERICA,
            PLAINTIFF,                              CASE NO. 17-cr-20469-SFC-DRG
                                                    HON. SEAN F. COX

V.

JASON MANNING,
            DEFENDANT.
_____/

RONNIE E. CROMER, JR., (P59418)
THE CROMER LAW GROUP PLLC
Attorney for Mr. Jason Manning - Defendant
24901 Northwestern Hwy., Ste. 612
Southfield, MI  48075
248-809-6790 (office)
248-587-7344 (facsimile)
rcromerjr@thecromerlawgroup.com
_____/

## DEFENDANT MANNING'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE

On August 3, 2013, at or around 10:30 p.m., DPD Sgt. Grzywacz

("Grzywacz") pulled up to the location at 473 Peterboro, in a black, unmarked car

and in plain clothes.  Dkt. #60, E.H. 8, Pg ID 257, 271.  Grzywacz testified that it

was dark out, and semi-lighted.  Id.  Grzywacz allegedly could identify defendant

Hendon under these conditions, after viewing him, "scramble" inside the

apartment building.[1]  Id. at 271, 291.  Grzywacz testifies that he called for back-up prior to entering the apartment building.  Id. at 274. Grzywacz testified that he *did not* see any of the individuals make any furtive gestures; *didn't* see anyone with any firearms; they *never* pointed any object toward he or his partner; there were *no* verbal/physical threats of harm/violence towards them; *no* objects were thrown in the officers' direction; he observed *no* hand-to-hand transactions that might be indicative of illegal drug sales; in fact he *never* observed any criminal activity afoot of any kind from any of the individuals prior to Hendon going into the apartment building.  Id. at 292-93.

However, based on the above observations, Grzywacz then radioed dispatch and waited for the back-up to arrive (DPD Officers Hughes and Reitz). *Id.* at 276-77.  Grzywacz testified that he waited for the arrival of back-up prior to entry into the apartment building because (Officers Hughes/Reitz) did not have keys to access the building and he would have had to let them in. *Id.* 276-77, 293-94.  Grzywacz does not recall who initially gave him keys but that he had a

---

[1] Grzywacz testified that he thought it was "**suspicious**" that (*in a high-crime area*) individuals standing outside the dimly lite apartment building, at 10:30 p.m., would "*scramble*" when a black, unmarked car, with two (2) plain clothed persons inside, pull up near the building and just sit idle, starring at them.  Grzywacz testified that the individuals were "apparently surprised at our presence" and decided to disburse. ***Grzywacz testified that he didn't think the circumstances presented, were similar or indicative of a possible "drive-by" shooting scenario which may have caused the individuals to be frightened/nervous and subsequently deciding to leave***.  Id. at 291-92.

key to the front apartment building entry door and a key to *all the vacant apartments.*[2]  Id. at 262, 275.

According to Grzywacz, *two-three weeks* prior to 8/3/13, he was allegedly told by (*some unidentified person(s)*) but who had apparent building authority, informed him that Apt. 201 was vacant.  *Id.* at Pg. ID 260.  Grzywacz testified that he had *never* seen this person before (let alone to be in a position to attest their credibility) but assumed (without inquiry) that the person had ownership rights. *Id.* at 279.  Grzywacz further testified that he did not get the keys from Jay Vanderslingerlandt, the on-site building "*superintendent*".[3]  *Id.* at 280.

Grzywacz testified that prior to 8/3/13, it had been between "*four, maybe six months*" since he had last spoken with the apartment superintendent (Jay Vanslingerlandts) or some agent of the apartment building that had authority - - - and that was a "*best guess*".  *Id.* at 296-97. Grzywacz testified that during that *four to six month time period and prior to 8/3/14* - he <u>never</u> received any

---

[2] Grzywacz testified that there were maybe thirty (30) apartment units in the building.  Id. at 284.  He was only aware of one person living in the building (older white female, Nell Martin, on the first floor),  Id. at 284.

[3] Grzywacz testified that he had about *ten (10) keys to vacant apartments* in the building, but due to the passage of time (**5 years**) he *no longer has the keys*.  *Id.* at 276.  Grzywacz testified DPD maintained a "greenbook, it was like a ledger book, that maintained the lists or notes (of the vacant/occupied apartments at 473 Peterboro) that would be shared between the squads/ units/shifts.  *Id.*  Grzywacz testified that his notepad/ticket book that would contain the information regarding the vacancy/occupancy of 473 Peterboro is *no longer in his possession*. *Id.* at 312.  Grzywacz testified that the ten (10) keys and his personal notes regarding the vacancy/occupancy were stored in a "file cabinet at work" or a "locker" that only he and his partner (Officer Derek Loringer) had access to.  *Id.* at 281-82.  Grzywacz testified that the superintendent would identify which apartments he was "having issues with, *either noise complaints or like loud music, partying, narcotics, people smoking marijuana in the apartments*" and that he would write out a list of those individual apartments.  *Id.* at 283.

information (oral or written) from any agent of the apartment building regarding an **update** with respect to current vacancies and/or occupancies at 473 Peterboro.  *Id.* at 298-99.  Grzywacz further testified that during the 2-3 week period prior to 8/3/13, he **did not** know whether the owner/manager of the building had leased/re-leased any of the apartments that had previously been noted as vacant.  *Id.* at 299.

Grzywacz also testified that he had received a list of vacant/occupied apartments for 473 Peterboro.  *Id.* at 267-68, 270.  He was given a list orally and he wrote it down.  *Id.* at 268.  Grzywacz states that Apt. 201 was on the list of vacant apartments, two-three weeks prior to warrantless entry.  *Id.* at 260, 267-70.  Grzywacz testified although he hadn't received any updates at least 2-3 weeks prior to 8/3/13, **he agreed that it was *possible* that the owner/manager could have leased Apt. 201 to a tenant - - - without his knowledge, prior to 8/3/13**.  *Id.* at 310-11.  Grzywacz testified that there was no agreement between

he and any owner/manager of the apartment building that they (owner/manager) would "*first notify*" him if any apartments were no longer vacant.[4]  *Id.* at 311.

When the back-up officers arrived, they all made entry into the building and started a protective sweep of the first floor (the basement was not checked).  *Id.* at 277.  Grzywacz testified that he does not recall any of the other apartments being searched/entered during the sweep.[5] Id. at 278.  Grzywacz *never* provided in his original PCR, his grand jury testimony or in his testimony at the evidentiary hearing that he saw a rifle/firearm or some long-object in his hand when he allegedly ran into the apartment building.  *Id.* at 272.  Grzywacz testified that he also did not see Manning standing outside the apartment building at the time he pulled up to the apartment building.  *Id.* at 307.

Grzywacz testified that during the protective sweep and upon approaching Apt. 201, he *does not recall* knocking on the door or announcing his presence prior to entry into the apartment.  *Id.* at 285.  *However*, Manning testified that

---

[4] William and Jay Vanderslingerlandts were subpoenaed to appear and offer testimony as well as to produce documents/things that would support the tenancy/occupancy/vacancy of 473 Peterboro for the year 2013.  **Exhibit A**.  That while the Vanderslingerlandts did appear for the hearing, the failed to produce a single document as requested in the subpoena, indicating that all such documents/things were no longer in existence due to the passage of time, but that they would have likely been available in 2013 or 2014.  That upon taking the stand for examination regarding the information as requested pursuant to the subpoena, they both through counsel Mark Kreiger, invoked their 5th Amendment right against self-incrimination, and refused to answer any and all material questions that would have aided the defendants and the Court with determining the issue of standing, as well as some of the credibility issues (or inconsistencies) surrounding Grzywacz's testimony.  More importantly, the Vanderslingerlandts refused to answer any questions regarding the name of the tenant(s) who maintained custody, control and/or possession of Apt. 201 on 8/3/13.

[5] However, Grzywacz testified before the grand jury that he/sweep team "checked all" the apartments that was on the "list" and then went up to Apt. 201.  Id. at 278.

while they were all sitting down listening to music, smoking and drinking — all of a sudden he heard a loud: "***Boom, Boom***," as if someone was kicking or banging at the door, at which time the door was kicked or pushed open and the officers entered.[6]  Id. at 327.

However, prior to entry, Grzywac testified that he *did not* hear any scrambling around the apartment or flushing of toilets (*as if destroying evidence of a crime*).  *Id*. at 310.  Grzywacz testified that he "made entry" and upon doing so, he saw a table, several chair(s), bookshelf, mattress, blanket, and even noticed that the windows had blinds.  *Id*. at 263, 286, 303, 307-08.  He also allegedly observed large sum of money (just under $3,000) on the table, a scale, narcotics, multiple cell phones and a shotgun.  *Id*. at 263-66, 268.  Grzywacz testified that the apartment was occupied by three (3) individuals (Manning, Hendon and Griffin).  *Id*.  Grzywacz testified that the utilities were on (*e.g.*, electricity/water working in the apartment).  *Id*. at 265, 323-24.

Grzywacz testified that all three (3) individuals were detained, handcuffed and arrested.  *Id*. at 266.  Grzywacz testified that upon Manning's arrest, he *never* questioned him about his *status/relationship to the apartmen*t.  *Id*. at 307, 309-10. Manning testified that had just arrived to the apartment about 30-minutes prior to the officer's entry.  Manning testified that he believed that the apartment

---

[6] Grzywacz claims that he entry to the apartment by way of key (as the apartment door was not boarded up). *Id*. at Pg. ID 261.

belonged to Griffin (his life-long, childhood friend) because he was told the same by Griffin himself and <u>prior</u> to 8/3/13.  *Id*. at 322.  Manning testified that he had been an *overnight guests for two (2) consecutive nights prior to 8/3/13;* and had seen Griffin access the apartment with a key, as well as the front door to the apartment complex.  *Id*. at 322-25.

During his examination, Manning testified that the apartment (201) was partially furnished with a mattress, chairs, a table, a radio, TV, mini-fridge, a microwave, clothing, some toiletries in the bathroom and the utilities (electricity and water were on/working). *Id*. at 323-24.  Manning testified that he, Hendon and Griffin had been listening to music, drinking beers and smoking a little weed in the apartment shortly before the officers forced entry into the apartment.  *Id*. at 324, 326.  Prior to the entry of said officers, Manning testified that he may have spent the night in Griffin's apartment <u>again</u>, if he felt "*too buzzed*".  *Id*. at 325.  Manning testified that during the two (2) nights that he spent in Griffin's apartment, he noticed that there were multiple tenants in the building, that he observed residing on the first and second floors.  *Id*. at 328.

After the three (3) individuals were arrested and handcuffed, the <u>entire</u> apartment was thoroughly searched by Grzywacz and the other officers.  *Id*.  At the time of Manning's arrest, Grzywacz wasn't aware of any open warrants for his arrest.  *Id*. at 309.  That *none* of the three (3) arrestees made any statements

surrounding the circumstances of their arrest in the apartment upon being

transported to the local PCT.  *Id*.

 After Grzywacz's evidentiary hearing testimony, *the government chose not*

*to call any other witnesses* as to the issue of probable cause to arrest Manning.

*Id*. at 316.  Defendants have moved this Court to suppress all of the evidence

seized during their unlawful arrest, arguing that the officer(s) lacked probable

cause to arrest them.  This Court ordered an evidentiary hearing and the same

was concluded on May 29, 2018.

### ISSUES

 **ISSUE I:  Whether there was probable cause for the warrantless
 entry into Apt. 201**.

 Defendant answers:  Yes
 Government answers:  No

 **ISSUE II:  Whether Defendant Manning has standing to challenge the
 warrantless entry as an overnight guest**.

 Defendant answers:  Yes.
 Government answers:  No

 **ISSUE III: Whether the David Griffin's *ex parte* proffer confession
 with law enforcement/AUSA should be admissible in lieu of invoking
 of his right against self incrimination**.

 Defendant answers:  No
 Government answers:  Yes

## ARGUMENT

**ISSUE I:  Whether there was probable cause for the warrantless entry into Apt. 201**.

A warrantless search of a house is per se unreasonable, *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), and absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment. *Steagald v. U.S.*, 451 U.S. 204, 211, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981).

Evidence recovered following an illegal entry into a home is inadmissible and must be suppressed. *See Wong Sun v. U.S.*, 371 U.S. 471, 484-87, 83 S.Ct. 407, 415-17, 9 L.Ed.2d 441 (1963). The legality of entry to execute a search warrant or to effect an arrest is a question distinct from whether the arrest or search is properly based upon probable cause or issued warrants. An illegal entry taints a search incident to such an arrest. *E.g., U.S. v. Davis*, 461 F.2d 1026 (3d Cir. 1972); *U.S. v. Cisneros*, 448 F.2d 298, 303 n.6 (9th Cir. 1971).

Although warrantless entries into a home to seize a person are presumptively unlawful, *see Groh v. Ramirez*, 540 U.S. 551, 559 (2004); *Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005), exigent circumstances will excuse a warrantless entry, *United States v. Huffmann*, 461 F. 3d 777, 782 (6th Cir. 2006). For this reason, police may enter a residence "'without a warrant if there is probable cause to believe that there is a burglary in

progress.'" *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (*quoting United States v. Reed*, 141 F.3d 644, 649 (6th Cir. 1993)).

Of course, a report of suspicious activity alone will not provide probable cause. *See id.* at 563.  But the report of a burglary corroborated by signs of forced entry or the presence of suspects inside the home would justify a warrantless entry. *See United States v. Johnson*, 9 F.3d 506, 509–10 (6th Cir. 1993) (holding that exigent circumstances and probable cause justified entry into a home that was reportedly burglarized when the police found a broken window and saw two individuals inside the home); *United States v. Estese*, 479 F.2d 1273, 1274 (6th Cir. 1973) (holding that exigent circumstances permitted police responding to a reported burglary to enter an apartment with a pried-open door).

Furthermore, a warrantless search that ends up providing probable cause for an arrest cannot be justified as incident to that arrest. *Smith v. Ohio*, 494 U.S. 541 (1990).[7]  Agents may not deliberately create exigent circumstances in order to subvert the warrant requirements of the Fourth Amendment. *E.g., U.S. v. Thompson*, 700 F.2d 944 (5th Cir. 1983); *U.S. v. Hare*, 589 F.2d 1291 (6th Cir.

---

[7] Government may claim that Manning had an open warrant for his arrest on August 3, 2013. However, the arresting officer **(Grzywack) testified that he was not aware that Manning had an open warrant at the time of his arrest**.  In *Moreno v. Baca*, 400 F.3d 1152, 1164, 2005 U.S. App. LEXIS 3739, *33-34, the question of **whether a search or seizure can be considered "reasonable" if the fact that rendered the search "reasonable"** (in this case, the outstanding arrest warrant) **was unknown to the officer at the time of the intrusion. We hold that it cannot."** *see also Illinois v. Rodriguez*, 497 U.S. 177, 188, 111 L. Ed. 2d 148, 110 S. Ct. 2793 (1990) (holding that "factual determinations bearing upon search and seizure" must be judged against an "objective standard" based on "facts available to the officer at the moment").

1979); *U.S. v. Rosselli*, 506 F.2d 627 (7th Cir. 1974); *U.S. v. Curran*, 498 F.2d 30

(9th Cir. 1974); *Niro v. U.S.*, 388 F.2d 535 (1st Cir. 1968).

Since the exigency doctrine is an exception to the ordinary Fourth

Amendment requirement of a warrant for entry into a home, the burden of proof

rests upon the government to show that the warrantless entry falls within the

exception. *See, e.g., Mincey v. Arizona*, 437 U.S. 385 (1978); *U.S. v. Jeffers*, 342

U.S. 48 (1951); *McDonald v. U.S.*, 335 U.S. 451 (1948); *U.S. v. Manfredi*, 722 F.

2d at 520.[8]

Where agents had probable cause to search the defendant's home, but

failed to get a warrant and were unable to point to any exigent circumstances, the

search was held to be invalid. *U.S. v. Suarez*, 902 F.2d 1466 (9th Cir. 1990); see

also *U.S. v. Warner*, 843 F.2d 401 (9th Cir. 1988) (no basis for believing illicit drug

activity taking place, evidence might disappear, or explosion might occur); *U.S. v.

Howard*, 828 F.2d 552 (9th Cir. 1987) (lack of knowledge of contents of boxes

and only a reasonable suspicion of presence of methamphetamine laboratory did

not justify warrantless entry), *cert. denied*, 485 U.S. 937 (1988); *U.S. v. Driver*,

776 F.2d 807 (9th Cir. 1985) (destruction of evidence too speculative to justify).

---

[8] *Espinosa v. City and County of San Francisco*, 598 F.3d 528 (9th Cir. 2010), *cert. denied*, 132 S. Ct. 1089, 181 L.Ed.2d 976 (2012) (neighbor's report that front door was swinging open and resident might be a drug house and security officer's statement that unit was supposed to be vacant and front door lock was approved lock installed by landlord did not bring case within emergency exception to warrant requirement).

Here, Grzywacz and his partner pull up near 473 Peterboro (an alleged high-crime area, in a dark, unmarked car and in plain clothes and just sits there eyeing the several individuals standing outside of the apartment building (*in Cass Corridor Detroit*).  That he **never** considers that fact that it looks like he's probably about to do a drive-by on the group, so when the individuals subsequently start to "*scramble*" from the location - some going into the apartment building - Grzywacz thinks their leaving from in front of the apartment building under these circumstances - - - is "**suspicious**".[9]

Grzywacz *never* puts in his report or testifies that any of the individuals were doing anything that would give him probable cause to arrest them (other than being outside of the apartment building).  He sees *no* illegal drug activity/ transactions (or anything remotely indicative of the same).  He sees *no* firearms or contraband of any kind prior to the back-up call or entry into the building. *None* of the individuals make any furtive gestures or threatening actions towards him or his partner.  Grzywacz  provides no details in his report or by way of sworn testimony that would allow the Court to believe that there was any emergency or exigent circumstance or potential danger to anyone in the area that would allow him to enter the apartment building or Apt. 201.

---

[9] Manning respectfully asserts that a reasonable and objective officer under the circumstances would not have made the dramatic leap that said actions by the above noted individuals as being "suspicious" for purposes of manufacturing probable cause to enter the building and Apt. 201, absent a search warrant, consent, exigent circumstances or some other valid exception to the search warrant requirement.

Grzywacz then calls for back-up and waits for them to arrive. No time was provided as to when said back-up officers arrived.  However, when they do arrive, all four (4) officers make entry into the apartment building because only Grzywacz has the key to open the front door to the building.  Upon entry, the officers conducted a protective sweep of at *least the first and second floor* (not the basement or third floors) and find no persons loitering the hallways.

However, notwithstanding the same, Grzywacz, without knocking and announcing his law enforcement presence, and/or attempting to gain consent from the occupied apartment dwellers that he knows are inside — in complete and reckless disregard for the rights of those inside - he forces open the door, encounters Manning, Hendon and Griffin inside, sitting down, listening to music, smoking and drinking in the partially furnished apartment.  Grzywacz alleges that all three (3) individuals occupying the apartment were immediately arrested/ handcuffed and the apartment was entirely searched, resulting in the alleged contraband being found after a search of the apartment.

Under the circumstances presented, defendant Manning respectfully claims that Grzywacz did not have the requisite reasonable suspicion, probable cause, consent, search warrant and/or any other valid exception to the search warrant requirement at the time of entry into Apt. 201; and as a result, any and all evidence seized pursuant to said warrantless entry should be suppressed as fruit

of the poisonous tree.  *Wong Sun v. U.S.*, 371 U.S. 471, 484-87, 83 S.Ct. 407,

415-17, 9 L.Ed.2d 441 (1963).

**ISSUE II:  Whether Defendant Manning has standing to challenge the warrantless entry as an overnight guest**.

In *Minnesota v. Carter*, 525 US 83, 119 S. Ct. 469, 142 L. Ed. 2d 373

(1998) the Court in suppressing evidence obtained as a result of a warrantless

entry, found that the defendant met his burden of showing that he had a

protectable interest in the house of another when the police entered in order to

seize him.  The Court further held that "[t]he text of the Amendment suggests that

its protections extend only to people in 'their' houses.   But we have held that in

some circumstances a person may have a legitimate expectation of privacy in the

house of someone else.  [F]or example, **we decided that an overnight guest in**

**a house had the sort of expectation of privacy that the Fourth Amendment**

**protects.**" 119 S.Ct. at 473 (citation omitted).

The government may contend that these facts are much too sketchy to

establish defendant Manning's "capacity to claim the protection of the Fourth

Amendment," which required both that he had "a subjective expectation of

privacy" in the invaded place and that this expectation was "legitimate," in that it

is "one that society is prepared to recognize as reasonable."  *Minnesota v. Olson*,

495 U.S. 91, 95-96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (holding that an

overnight guest "has a legitimate expectation of privacy in his host's home"

because "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society").  Id. at 98-99. [Emphasis added].

However, defendant Manning points out that there was evidence that he spent at least two (2) consecutive nights at 473 Peterboro, in Apt. 201 and that he was occupying the same at the date and time of his arrest.  That he reasonably believed the same to be his lifelong childhood friend (David Griffin's) apartment, as the apartment was partially furnished, contained several chairs, a table, mattress, blanket, some clothing, mini-frig/microwave, radio, window blinds, utilities/lights on, water was running/toilet working, toiletries in the bathroom, *etc.*, and the same were present during the two (2) consecutive days he stayed overnight prior to the warrantless entry on 8/3/13.  That Manning further testified under oath that he had seen Griffin use a key to access the building/apt; and that the apartment door was <u>not</u> boarded up (indicative of a vacant apartment).   Manning argues that these facts all support his subjective expectation of privacy

Based on these unchallenged/un-rebutted facts, the government has failed to show this Court that David Griffin was a mere trespasser as inferred.  For these reasons, the Court should accept Manning's sworn testimony, under the penalty of perjury, that he was in fact, an overnight guest in Apt. 201 (David

Griffin's apartment on 8/3/13) and that he was entitled to a reasonable

expectation of privacy pursuant to the Fourth Amendment of the U.S.

Constitution.

**ISSUE III: Whether the David Griffin's *ex parte* proffer confession with law enforcement/AUSA should be admissible in lieu of invoking of his right against self incrimination**.

In *Crawford v. Washington*, 541 US 36 124 S.CT. 1354 (2004) - The

Supreme Court caselaw on hearsay and constitutional right of confrontation

requires distinguishing among four categories of hearsay statements:

1. prior statements by witnesses who testify in the present proceeding under oath and are subject to cross-examination concerning prior statement;
2. former testimony of presently unavailable witness;
3. other hearsay falling within a "firmly rooted exception;
4. and hearsay not falling within a "firmly rooted exception.

In *Crawford*, the Supreme Court did not change the treatment of evidence

as it relates to prior statements by witnesses made under oath and former

testimony of unavailable witness, but it did substantially change treatment of

hearsay statements by non-testifying declarants offered under hearsay

exceptions, whether firmly rooted or not.

The government will likely claim that the statements made by Griffin during

his ex parte proffer confession[10] with the prosecutor and law enforcement

officials (*i.e.,* his 302 report), whereby he partially inculpates himself in criminal

---

[10] Statements taken by police officers in the course of interrogations are also testimonial. *Crawford*, 541 US at 51-52.

activity, should be admissible under Rule 804(b)(3).  However, such a statement

(against penal interest) <u>does not</u> qualify as within a "firmly rooted" exception.

*Lilly v. Virginia*, 527 US 116, 134, 119 S.T 1887, 1889 (1999) (*plurality opinion*).

Moreover, because Griffin's *ex parte* proffer confession to law enforcement

was *testimonial*, the constitutional right of confrontation and cross-examination

becomes <u>absolute</u> and no showing of reliability, whether based on a "firmly

rooted exception" or particularized indicia, can substitute.  *See Crawford* 541 US

at 51, 124 S.Ct. at 1364.

The *Crawford* Court described the term "*testimonial*" as "*ex parte* in-court

testimony or its functional equivalent - that is, material such as affidavits,

custodial examinations, prior testimony that the defendant was unable to cross-

examine, or similar pretrial statements that declarants would reasonably expect

to be used prosecutorially[.]"  *Id.* at 38.  Further, "the Confrontation Clause is

implicated by extrajudicial statements . . . contained in formalized testimonial

materials, such as affidavits, depositions, prior testimony or confessions,"  *White*

*v. Illinois*, 502 US 346, 365, 112 S.Ct. 736 (1992).

In the instant case:

- *no* fellow officer rule is applicable here (nor argued/advanced by government);

- *no* hearsay exception under FRE 801(d)(2)(A) (Griffin - - - while arrested along

   with both Manning and Hendon - - - to date, has  ***never*** been charged/

indicated for any criminal offense arising out of warrantless entry on August 3, 2013 and thus, he is not an *opposing party*); *nor* do any of the FRE 803 (enumerated hearsay exceptions) apply;

- ***no*** sworn testimony by David Griffin - Although, Griffin did take the stand at the evidentiary hearing, he specifically ***<u>refused</u>*** to answer any and all material questions posed to him by defense counsel to attest his credibility/veracity, choosing instead to invoke his Fifth Amendment right against self-incrimination.

- The primary issues at bar before the Court at the evidentiary hearing were  (1) ***probable cause for the warrantless entry and*** *(2)* ***standing to challenge said entry*** into the Apt. 201.  That Griffin ***<u>refused</u>*** to answer any and all questions regarding the facts surrounding the probable cause inquiry; the illegal contraband found in the apartment; the circumstances surrounding how the arresting officers entered the apartment; the custody, control and/or possession of said apartment, and including but not limited to any other potential (*e.g.*, exculpatory) witnesses that may support defendant Manning's affirmative defenses.

- Thus, Griffin was otherwise **<u>not</u> available for cross-examination at the suppression hearing or at the time he made his self-serving and unverified proffer confession to law enforcement officials**.

- That the proffered *ex parte* statements challenged by Manning - came **5-years after the incident** in question and made under circumstances that benefit **ONLY** Griffin (creating a credibility/trustworthiness issue that defeats any claim of reliability based on the circumstances of this particular case).

- Many, if not all, of the statements to which the government may seek to offer to rebut Manning's standing claim - come <u>directly</u> from Griffin (**5-years post the incident/arrest**) and are offered for nothing more than the truth of the matter asserted as to all <u>material</u> facts necessary to aid the Court in deciding admissibility and other issues pertinent to the evidentiary hearing.

- Furthermore, it is important to note that **<u>NONE</u> of the material/incriminating statements offered by Griffin** (via a task force agent Zerbcot - who had <u>no personal knowledge</u> of said events of 8/3/13 and was *only* present at the time Griffin gave the proffer) **were facts known to any law enforcement officer until 5-years later.**

- Thus, under the totality of circumstances before the Court, if the agent's subsequent reading of Griffin's *ex parte* proffer confession into the record are to be deemed admissible (*especially where there are serious concerns as to the accuracy/reliability of said statements*) the same would essentially allow the government to circumvent defendant Manning's Sixth Amendment right to confrontation and boost or vouch for Griffin's credibility as a witness on the

paramount issues of probable cause and standing, to wit, he exercised his

constitutional right to not incriminate himself - - - to defendant Manning's

prejudicial demise.[11]

The Court should not accept the hearsay statements relating to events that

allegedly occurred *5-years ago*, as there are **no** well-rooted hearsay exceptions;

**nor** any other credible and/or admissible evidence sufficiently reliable and/or

trustworthy to override Manning's confrontation clause concerns and other

prejudicial effects.  *White v. Illinois*, 502 US 346, 352, 112 S.Ct. 736, 741 (1992).

## **CONCLUSION**

For these reasons the Court should preclude agent Zerbcot's testimony of

reading into the record David Griffin's *ex parte* proffer confession statement (*i.e.,*

the 302 exhibit) as the same is inherently unreliable and violative of Defendants'

Sixth Amendment right to confrontation; find that the government has not

rebutted Manning's legitimate expectation to privacy as an overnight guest in

---

[11] It is important for the court to note that on October 11, 2016, Griffin was arrested on drug charges, unrelated to the instant offense.  During his incarceration, his interrogation was video recorded and he can be seen/heard crying while repeatedly telling the officer that "***I can't afford a felony***"; "***There's things that can be done***"; "***Is there anything that can be done about this felony please?***" "***I'm pleading . . . I need some help; I don't want to go to prison***"; "***Is there anything you can do man - I don't want to take the felony; If it's anything, if it's anything, anything to do, if it's anything I can do, I'm willing to do it***."  The interrogating officer responding:  "**There's different ways you can help yourself out - something that we can get to later on**."  Subsequent to this video interrogation, David Griffin and his counsel, met with law enforcement officials/AUSA and made the challenged *ex parte* proffer confession that the government now seeks to persuade the Court that the same is *reliable, truthful and accurate* in lieu of Griffin being thoroughly and vigorously cross-examined by defense counsel regarding the aforementioned statements.

Griffin's apartment; and suppress any and all evidence (tainted fruit) so ill

retrieved, as a direct result of Grzywacz's lack of probable cause to enter Apt.

201, absent a search warrant, exigent circumstances or any other valid exception

for his warrantless intrusion.  *Wong Sun v. U.S.*, 371 U.S. 471, 484-87, 83 S.Ct.

407, 415-17, 9 L.Ed.2d 441 (1963).


Respectfully submitted,

**/s/ Ronnie E. Cromer, Jr.,**
RONNIE E. CROMER, JR., (P59418)
THE CROMER LAW GROUP PLLC
Attorney for Mr. Manning

Dated:  June 18, 2018